1  Robert Hamparyan (State Bar No. 181934)
   ROBERT HAMPARYAN, APC
2  275 W. Market Street
   San Diego, CA 92101
3  t. 619.550.1355
   e. robert@hamparyanlawfirm.com
4
   John J. O'Brien (State Bar No. 253392)
5  THE O'BRIEN LAW FIRM, APLC
   750 B Street, Suite 3300
6  San Diego, CA 92101
   t. 619.535.5151
7  e. john@theobrienlawfirm.com
8  Brian M. Holm (State Bar No. 255691)
   HOLM LAW GROUP, PC
9  12636 High Bluff Drive, Suite 400
   San Diego, CA 92130
10 t. 858.707.5858
11 e. brian@holmlawgroup.com

12 **Attorneys for Plaintiffs**

13

14              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

15                          **COUNTY OF SAN DIEGO**

16 JANE DOE NO. 17, an individual; JANE DOE      | CASE NO.:**37-2017-00043712-CU-FR-CTL**
   NO. 18, an individual; JANE DOE NO. 19, an
17 individual; JANE DOE NO. 20, an individual;    | **COMPLAINT (FILED UNDER SEAL)**
   JANE DOE NO. 21, an individual; JANE DOE
18 NO. 22, an individual; inclusive,             | **[JURY TRIAL DEMANDED]**

19                                                | 1. Intentional Misrepresentation
              Plaintiffs,                         | 2. Fraudulent Concealment
20 v.                                             | 3. False Promise
                                                  | 4. Negligent Misrepresentation
21 GIRLSDOPORN.COM, a business                    | 5. Misappropriation of Name & Likeness
   organization, form unknown; MICHAEL J.        |    [Common Law]
22 PRATT, an individual; ANDRE GARCIA, an         | 6. Misappropriation of Name & Likeness
   individual; MATTHEW WOLFE, an                  |    [Civ. C. § 3344]
23 individual; BLL MEDIA, INC., a California      | 7. Intentional Infliction of Emotional Distress
   corporation; BLL MEDIA HOLDINGS, LLC,         | 8. Negligence
24 a Nevada limited liability company; DOMI      | 9. Breach of Contract
   PUBLICATIONS, LLC, a Nevada limited           | 10. Promissory Estoppel
25 liability company; EG PUBLICATIONS, INC.,     | 11. Unlawful & Fraudulent Business Practices
   a California corporation; M1M MEDIA, LLC,     |    [Bus. & Prof. Code §17200]
26 a California limited liability company;        | 12. Fraudulent Transfer
   BUBBLEGUM FILMS, INC., a business             | 13. Declaratory Relief
27 organization, form unknown; OH WELL           |
28

                                    1
                              **COMPLAINT**

F I L E D
Clerk of the Superior Court

NOV 0 8 2017

By: R. BABERS, Deputy



1  MEDIA LIMITED, a business organization,
   form unknown; MERRO MEDIA, INC., a
2  California corporation; MERRO MEDIA
   HOLDINGS, LLC, a Nevada limited liability
3  company; CLOCKWORK PRODUCTIONS,
   INC., a business organization, form unknown;
4  UHD PRODUCTIONS, LLC, a Wyoming
   limited liability company; BUBBLEGUM
5  FILMS, LTD., a business organization, form
   unknown; GREENHILL SERVICES, LTD., a
6  business organization, form unknown; SIDLE
   MEDIA LIMITED, a business organization,
7  form unknown; RIVA YOUSIF, an individual;
   THEODORE GYI, an individual; VALERIE
8  MOSER, an individual; KAILYN WRIGHT,
   an individual; and ROES 1 - 550, inclusive,
9
10              Defendants.
11
12
13     This action is intricately related to San Diego Superior Court Case Nos. 37-2016-19027-CU-

14  FR-CTL and 37-2017-00033321-CU-FR-CTL where sixteen similarly situated young women sue the

15  same fraudulent pornography business for nearly identical claims.

16                                    ----

17     Plaintiffs JANE DOE NO. 17, JANE DOE NO. 18, JANE DOE NO. 19, JANE DOE NO. 20,

18  JANE DOE NO. 21, JANE DOE NO. 22 (all plaintiffs collectively, "Plaintiffs") bring this complaint

19  against defendants GIRLSDOPORN.COM, a business organization, form unknown; MICHAEL J.

20  PRATT, an individual; ANDRE GARCIA, an individual; MATTHEW WOLFE, an individual; BLL

21  MEDIA, INC., a California corporation; BLL MEDIA HOLDINGS, LLC, a Nevada limited liability

22  company; DOMI PUBLICATIONS, LLC, a Nevada limited liability company; EG PUBLICATIONS,

23  INC., a California corporation; MIM MEDIA, LLC, a California limited liability company;

24  BUBBLEGUM FILMS, INC., a business organization, form unknown; OH WELL MEDIA LIMITED,

25  a business organization, form unknown; MERRO MEDIA, INC., a California corporation; MERRO

26  MEDIA HOLDINGS, LLC, a Nevada limited liability company; CLOCKWORK PRODUCTIONS,

27  INC., place of incorporation unknown; UHD MEDIA, INC., place of incorporation unknown;

28  BUBBLEGUM FILMS, LTD., place of incorporation unknown; GREENHILL SERVICES, LTD.,

                                    2

1  place of incorporation unknown; SIDLE MEDIA LIMITED, place of incorporation unknown; RIVA

2  YOUSIF, an individual; THEODORE "TEDDY" GYI, an individual; VALERIE MOSER, an

3  individual; and ROES 1-550 (all defendants collectively, "Defendants").

**THE PARTIES**

**Plaintiffs**

1.      JANE DOE NO. 17 is an individual residing in the State of California.

2.      JANE DOE NO. 18 is an individual residing in the State of Utah.

3.      JANE DOE NO. 19 is an individual residing in the State of Nevada.

4.      JANE DOE NO. 20 is an individual residing in the State of Florida.

5.      JANE DOE NO. 21 is an individual residing in the State of New York.

6.      JANE DOE NO. 22 is an individual residing in the State of Georgia.

**Defendants**

7.      GIRLSDOPORN.COM is a business organization, form unknown, with its principal place of business in San Diego County, California.

8.      BLL MEDIA, INC. is a California corporation with its principal place of business in San Diego County, California.

9.      BLL MEDIA HOLDINGS, LLC is a Nevada limited liability company with its principal place of business in Clark County, Nevada.

10.     DOMI PUBLICATIONS, LLC is a Nevada limited liability company with its principal place of business in Clark County, Nevada.

11.     EG PUBLICATIONS, INC. is a California corporation with its principal place of business in San Diego County, California.

12.     M1M MEDIA, LLC is a California limited liability company with its principal place of business in San Diego County, California.

13.     BUBBLEGUM FILMS, INC. is a business organization, form unknown, with, on information and belief, its "principal place of business" in Port Vila, Vanuatu.

14.     OH WELL MEDIA LIMITED is a business organization, form unknown, with, on information and belief, its "principal place of business" in Port Vila, Vanuatu.

3

**COMPLAINT**

15.     MERRO MEDIA, INC. is a California corporation with its principal place of business in San Diego County, California.

16.     MERRO MEDIA HOLDINGS, LLC is a Nevada limited liability company with its principal place of business in Clark County, Nevada.

17.     CLOCKWORK PRODUCTIONS, INC. is a corporation.  Plaintiffs are unaware of what state or foreign nation it is incorporated in.

18.     UHD PRODUCTIONS, LLC is a limited liability company organized in the State of Wyoming with its principal place of business in San Diego, California.

19.     BUBBLEGUM FILMS, LTD is a business organization, form unknown, with, on information and belief, its "principal place of business" in Port Vila, Vanuatu.

20.     GREENHILL SERVICES, LTD. is a corporation.  Plaintiffs are unaware of what state or foreign nation it is incorporated in.

21.     SIDLE MEDIA LIMITED is a corporation.  Plaintiffs are unaware of what state or foreign nation it is incorporated in.

22.     On information and belief, GIRLSDOPORN.COM, BLL MEDIA, INC., BLL MEDIA HOLDINGS, LLC, DOMI PUBLICATIONS, LLC, EG PUBLICATIONS, INC., M1M MEDIA, LLC, BUBBLEGUM FILMS, INC., OH WELL MEDIA LIMITED, MERRO MEDIA, INC., MERRO MEDIA HOLDINGS, LLC; CLOCKWORK PRODUCTIONS, INC., UHD PRODUCTIONS, LLC, BUBBLEGUM FILMS, LTD., GREENHILL SERVICES, LTD, SIDLE MEDIA LIMITED and ROES 1 - 250 ("THE ENTITY DEFENDANTS") are entities in the business of online pornography production, distribution, and sales.  On information and belief, THE ENTITY DEFENDANTS own and/or operate numerous online pornography websites, including, without limitation, www.girlsdoporn.com, www.girlsdotoys.com and www.mompov.com.

23.     MICHAEL J. PRATT ("PRATT") is an individual residing in San Diego County, California.  On information and belief, he is a sales agent and representative, and the majority or sole shareholder, managing member, and/or chief executive officer of each of THE ENTITY DEFENDANTS.

24.     ANDRE GARCIA ("GARCIA") is an individual residing in San Diego County, California.  On information and belief, he is a sales agent and representative for each of THE ENTITY DEFENDANTS

4

1  – as well as a participant and "actor" in their pornography.

2  25.    MATTHEW WOLFE ("WOLFE") is an individual residing in San Diego County, California.

3  On information and belief, he is a sales agent and representative for each of THE ENTITY

4  DEFENDANTS – as well as a videographer of their pornography.

5  26.    RIVA YOUSIF ("YOUSIF") is an individual residing in San Diego County, California.

6  27.    THEODORE GYI ("GYI") is an individual residing in San Diego County, California.

7  28.    VALERIE MOSER ("MOSER") is an individual residing in San Diego County, California.

8  29.    KAILYN WRIGHT ("WRIGHT") is an individual that Plaintiffs are informed and believe and

9  thereon allege lives in Maricopa County, Arizona.

10  30.    On information and belief, ROES 251 – 500 are other shareholders, members, officers, sales

11  agents, representatives, videographers, and/or "actors" of THE ENTITY DEFENDANTS.

12  31.    Plaintiffs are ignorant of the true names, capacities, and/or liabilities of defendants sued herein

13  as ROES 1 - 550, inclusive, and therefore sue these defendants by such fictitious names and allege that

14  ROES 1 - 550 are responsible in some manner for the occurrences herein alleged.  Plaintiffs will amend

15  this complaint to allege their true names, capacities, and/or liabilities when ascertained.

16  32.    In doing all things alleged herein, including, without limitation, corresponding, negotiating, and

17  contracting with Plaintiffs, Defendants were agents, servants, representatives, partners, joint venturers,

18  affiliates, parents, subsidiaries, and/or employees of each other in the acts and/or omissions herein

19  alleged.  Defendants were and are acting within the course and scope of their authority as such agents,

20  servants, representatives, partners, joint venturers, affiliates, parents, subsidiaries, and/or employees

21  and with the permission, authorization, consent, and ratification of each other.

22  33.    In doing all things alleged herein, including, without limitation, corresponding, negotiating, and

23  contracting with Plaintiffs, THE ENTITY DEFENDANTS, PRATT, GARCIA, WOLFE, GYI,

24  MOSER, YOUSIF, WRIGHT, and ROES 251 – 550 acted as alter egos of each other.  In particular,

25  they: (a) commingled their funds and other assets, failed to segregate funds between them, and have

26  without authorization diverted corporate funds and assets for noncorporate uses; (b) treated each other's

27  assets as their own; (c) issued shares of one other to themselves and third parties haphazardly and

28  without authority; (d) held themselves out as being personally liable for the debts of each other; (e)

5

**COMPLAINT**

1  failed to maintain minutes and corporate records, and confused of the records of the separate entities;

2  (f) used the same business locations and employed the same employees; (g) failed to adequately

3  capitalize the entities; (h) used each other as a conduit for a single venture of themselves; (i) failed to

4  maintain arm's length relationships among themselves; and (j) diverted assets without consideration

5  from/to one another to the detriment of creditors, including Plaintiffs. Recognition of the privilege of

6  separate existences between these defendants would promote injustice, unfairness, and fraud. Any

7  separateness is to be disregarded. As such, Defendants are jointly and severally liable in this action as

8  alter egos.

9  **JURISDICTION AND VENUE**

10  34.     This Court has jurisdiction over Defendants as they are physically present in San Diego County,

11  California and/or because Defendants committed the subject acts and omissions in San Diego County,

12  California.

13  35.     Venue is proper as San Diego County is where Defendants reside and have their principal place

14  of business, the subject contracts were entered into, and/or the obligations and liability arose.

15  **FACTUAL ALLEGATIONS**

16  **Defendants' Business Scam: Lie to Young Women and Con them into Online Pornography**

17  36.     Defendants collectively run pornography websites, the main website being

18  www.girlsdoporn.com, a subscription-based amateur pornography website, which gets more traffic than

19  the San Diego Padres website. Defendants also collectively operate subscription based websites

20  www.mompov.com and www.girlsdotoys.com. In addition, Defendants have numerous free websites

21  where they publish short clips of the videos as advertisements for their subscription-based websites.

22  Defendants also run advertising websites that link to each of their subscription-based websites. For

23  example, Defendants' website www.girls-do-porn.com, which features Plaintiffs' likenesses, contains

24  advertisements and links to Defendants' "sister website" www.mompov.com. Likewise, Defendants'

25  website www.mompov.net, contains advertisements and links to www.girlsdoporn.com.

26  **Defendants use offshore shell companies set up by a group notorious for money laundering and**

27  **tax evasion to run their fraudulent operation**

28  37.     Although Defendants use several entities to run the three subscription websites, they are

6
**COMPLAINT**

1  inextricably linked as a single operation run by a handful of people out of the same office space in

2  downtown San Diego, California, operated by the same credit card processing companies, and utilizing

3  the same sham offshore entities set up by the infamous GT Group, Ltd, which has laundered billions of

4  dollars for nefarious business operations such as the Sinoalan Cartel and Ukrainian gun runners.   GT

5  Group Ltd. operates out of the tiny Pacific island nation, Vanuatu.  It website, since taken offline,

6  boasted:

> GT Group Offshore has three typical packages for Nominee Services, allowing you to
> achieve total privacy for yourself or your client. Through our vast experience and
> knowledge of offshore services, we have been able to package these services to suit
> almost any requirement. Should you seek something slightly different to our standard
> options, please talk to us. It is also important to note that the fees shown below are our retail
> fees. For your special discount price, please talk to us.

38.    For a Level III package, the customer gets:

> - Two Nominee Directors / Shareholders / Managers
> - Printing your prepared documents
> - Signing of up to 50 documents
> - Power of Attorney, signed by both Nominees with Apostille (you provide the name &
> details for our standard POA)
> - Standard Resignation letter from each director
> - Copy of each Directors Passport with Notarial Certification
> - Notarisation and Apostille of one more document

39.  ·  To provide this "nominee" service, GT Group Limited incorporates thousands of shell

companies that, on paper, list a local (i.e. the "nominees") as the director, shareholder and officer of the

company.  GT Group Limited then pays these locals to sign the documents necessary to keep its shell

companies in good standing.  However, the locals play no part in the shell companies other than signing

the documents.  GT Group Limited then contracts with people seeking to utilize the anonymity of these

shell companies owned by the locals to conduct business anonymously.  Defendant Oh Well Media

Limited, for example, is owned on paper by Abigail Kalopung—a local on Vanuatu.  She is the sole

shareholder, officer and director of Oh Well Media Ltd.  By paying GT Group Limited's fee,

Defendants, however, control Oh Well Media Limited, giving them the ability to open bank accounts

and enter into contracts in the company's name.

40.    Defendants have set up at least three sham entities using GT Group Limited.  Defendants'

1   website www.girlsdoporn.com indicates that it uses Oh Well Media Limited as its 2257[1] custodian and

2   lists its address as P.O. Box 6195, Port Vila, Vanuatu 65774, Poteau 540 208, Ave Due Capitain Cook

3   Seaside, Port Vila, Vanuatu 65774.  Defendants' website www.girlsdoporn.com lists its 2257 custodian

4   as Sidle Media Limited, P.O. Box 6193 Port Villa, Vanuatu, Poteau 540 208, Ave Due Capitain Cook

5   Seaside, Port Vila, Vanuatu 65774.  Finally, Defendants' other subscription website

6   www.mompov.com lists its 2257 custodian of records as "BUBBLEGUMFILMS INC" (sic), c/o GT

7   Group Limited, 1st Floor Pacific Building, Port Vila, Vanuatu 65774.  www.girlsdoporn.com used to

8   list Bubblegum Films Inc. as its 2257 custodian at this same address but has since changed it to a

9   different sham entity started by GT Group Limited named Oh Well Media Limited.

10  **Defendants lie to the victims, repeatedly**

11  41.      The young women appearing in Defendants' amateur pornography come from good families,

12  have never appeared in pornography before, are often paying their way through school, and are just

13  beginning their careers and adulthood.  So, there is only way Defendants can convince these women to

14  have sex on film or produce other adult video material: Defendants lie to them.

15  42.      Defendants advertise themselves across the country as a legitimate Southern California

16  modeling agency - on Craigslist and other websites.  Defendants' Craigslist advertisements fail to even

17  mention that they are an online pornography company.  Instead, they claim they are seeking models,

18  and often times contain a link in the Craigslist advertisement to www.beginemodelling.com or

19  www.modelinggigs.com.  Neither of these websites mention anything about pornography.  Using the

20  impression that they are applying for a typical modeling gig for, at most, swimsuit or lingerie, these

21  sham websites lure women into providing Defendants with pictures of themselves and their name, age,

22  height, weight, state, city, email, and phone number. If Defendants feel they have attracted a proper

23  target, they reach out to the women by phone and/or email in order to feel the women out more.  Once

24  on the phone, Defendants are able to brazenly lie to the women without the fear of putting their lies in

25  writing, and in hopes of being able to cajole the women into filming a pornography.

26  _____

[1] 18 U.S.C. 2257 requires pornography companies to collect certain information from all persons appearing in the
27  pornographic films the produce to ensure they are over 18 years of age.  Despite being operated out of San Diego,
Defendants list Oh Well Media Limited, Sidle Media Ltd. and Bubblegum Films, Inc. as their 2257 custodians on their
28  websites www.girlsdoporn.com, www.girlsdotoys.com and www.mompov.com, respectively.  The entities have the same
address in Vanuatu--- Poteau 540 208, Ave Due Capitain Cook, Seaside, Port Vila, Vanuatu 65774.

43.     When the young women ask Defendants where they will distribute the video, Defendants assure them that they will not post the video online (or cause it to be so posted), they will not distribute the video in the United States (or cause it to be so distributed), and they will keep each woman anonymous. Defendants represent the videos will be on DVDs overseas (usually in Australia or New Zealand since Defendants' themselves are from there and have an accent) and for private use.

44.     If still not convinced by their lies, Defendants provide "references" who Defendants claim previously shot a video (but, whose video is not yet released), to vouch for Defendants and promise the same security, limited distribution, and anonymity.  In addition, Defendants use several references that either have not shot a video, or who know the videos are being posted online but are comfortable lying to the prospective victims in order to earn a few dollars.  Defendants coach the references on how to handle various questions from the prospective women. As further incentive to lie to the women, Defendants pay the reference more money if the prospective victim they speak with actually ends up filming a video.  Defendant WRIGHT is such an individual.  WRIGHT filmed a video for Defendants that was released in the Spring of 2015.  WRIGHT was aware of Defendants' websites, that the women's names would be released, but nevertheless acted as a reference for Defendants and repeatedly lied to prospective victims by telling them the videos would not be posted online, and would instead be released on DVDs in foreign countries.

45.     For example, on February 24, 2016 at 7:23pm, a victim of Defendants' fraudulent scheme received an email from "Jonathan N jobs@beginmodeling.com" stating:

> This is Kaitlin, she is 19.
> She is from Scottsdale, AZ and has done 2 shoots with us.
> We pretty much paid for her breast job and she is recovering.
> She also worked with the same talent that you will work with
> Here is her cell: (480) \*\*\*-\*\*\*\*,

[Formatting and sics in original.] The email had photographs of defendant WRIGHT attached.

46.     An hour or so after this email, on February 24, 2016, the victim received a text message from (480) \*\*\*-\*\*\*\*, which is the same phone number Jonathan provided for WRIGHT.  The following text exchange occurred between the victim and WRIGHT (Defendants' paid agent):

| | | |
|---|---|---|
| 1 | WRIGHT: | Hey [victim's name omitted] my name is Kailyn- Jonathon gave me your contact info! Im sure you're nervous or maybe even sketched out a little bit but you seriously have nothing to worry about! It's completely legit, once you land (if you're flying in from out of town that is*) you will be picked up in a nice car and taken to where you are shooting your scene and all that OH AND they pay you in cash up front! |

2

3

4

Okay so I am a very easily sketched out person when it comes to stuff like this I was very Nervous but once I got there I felt like a complete idiot because I realized I had nothing to worry about haha - lowkey was a little embarrassed haha (emojis omitted) The model is super hot which is nice (emojis omitted) and the photographer is super cool

5

6

7

It's you, the model, and the photographer in the room and no one else so it's not uncomfortable or anything which is chill Girl if you have any questions please **DO NOT**hesitate to text me or call or FaceTime or whatever!!!! (emojis omitted)

8

9

10

| 11 | VICTIM: | Hey thank you for being so nice! That's exactly where I am at! |
|---|---|---|
| 12 | | These aren't distributed in America right? |
| 13 | WRIGHT: | No prob! And no they aren't! |
| 14 | VICTIM: | Is there anyway they can get back to the US? I just have this shaky thing with this guy I like love and I can't have anyone find out |
| 15 | | |
| 16 | WRIGHT: | No no no you're totally fine! |
| 17 | | That's what I was worried about but there is absolutely no way anyone will find out |
| 18 | | |
| 19 | VICTIM: | Where are the videos going exactly? Like DVDs I think he said in Australia UK, but like DVDs or .. ? |
| 20 | WRIGHT: | Yeah so it goes out to wealthier countries; yea DVDs and stuff like that but nothing online! |
| 21 | | |

47.   In their discussions with these young woman, Defendants use aliases and mention nothing about their website(s) where they plan to post the videos, or the websites on which they plan to publically promote and advertise the videos.  Defendants also mention nothing about: (a) all of the other young women whose lives they have irreparably damaged earlier by Defendants' video publication and promotion (b) all of the other young women imploring them to stop and to take down their videos; and (c) all of the complaints that they (and their legal counsel) have received from other young women and their families.

48.     After Defendants lie to the young women, they book rooms at upscale San Diego County hotels, most often at major high-end chains in downtown San Diego (e.g., Hilton, Hyatt, Marriot).  If the young women are not in Southern California, Defendants book flights for the women.

49.     Defendant YOUSIF, MOSER or GARCIA typically pick the women up from the airport.  In the car, they reassure the women Defendants will not publish the videos on the Internet.

50.     Once the young women are confined to the hotel room, Defendants tell the women they look nervous, need to relax and then try to persuade them to drink alcohol and/or smoke marijuana, which GARCIA consumes regardless of whether the women choose to do so.  YOUSIF typically acts as the makeup artist for most women.  While applying makeup, YOUSIF again reassures the women the video will not be released online, and generally appeases any concerns the women express.

51.     Before filming begins, GARCIA asks the women to take off their clothes so that they may take pictures to send to the "boss."  After sending the pictures to the boss. Defendants routinely tell the women, after they have flown to San Diego, are naked, and confined in a hotel room, that the boss cannot pay them the agreed upon price because the woman has cellulite, a bruise, breast reduction scars, too small breasts, tattoos, etc.  Defendants routinely accuse the women of sending them misleading pictures in hopes to con the women into accepting less than they were promised before flying to San Diego. If the woman refuses to shoot the film for less money, Defendants threaten to sue the woman for the price of the flight and hotel room Defendants had paid for or threaten to cancel the woman's return flight, which Defendants booked and have control over.   The vast majority of women flown to San Diego are paid less than the agreed upon amount when they decided to board a plane and fly across the country.

52.     After the repeated misrepresentations, and sometimes after alcohol and marijuana Defendants provide, and while confined in a hotel room with unknown men, Defendants present the women with documents to sign: (a) often under duress, coercion, and/or while distracting or rushing them; (b) while continuing to orally misrepresent their intent for the video's eventual distribution; (c) while continuing to fraudulently omit the material facts referenced herein (e.g., that they work for a San Diego-based pornography website that has damaged other young women's lives); and (d) often lying about the purported nature and effect of the documents.  The documents are full of legalese and fail to mention

11

COMPLAINT

1  www.girlsdoporn.com or any of the free public websites that Defendants intend to publish the videos.

2  Instead, the documents indicate Defendants work for "Bubblegum Casting" or "BLL Media." If the

3  names of these companies are Googled, which several women have done when presented with the

4  documents, the companies have sham websites that give the impression they are legit media companies.

5  Nothing on either of these websites indicates the videos are destined for www.girlsdoporn.com, any of

6  Defendants' other websites, or free websites like www.pornhub.com, where Defendants' videos have

7  been viewed almost 500 million times.

8  53.     A few months after filming, despite their earlier representations, Defendants release the videos

9  on, at least, www.girlsdoporn.com (their monthly subscription-based website) and www.girls-do-

10 porn.com (a free website with clips of the videos that then directs the user to www.girlsdoporn.com).

11 Defendants also release/license all or part of the videos all over the Internet on a multiple of free

12 pornography websites – in part, to advertise www.girlsdoporn.com with the images and likenesses of

13 the young women. Defendants post clips of the videos on popular websites like www.youporn.com or

14 www.pornhub.com as advertisements.

15 54.     Interestingly, and by no accident, GARCIA'S (and any other male participant's) face is

16 intentionally cut from the frame and not shown in any video released by Defendants. Soon after the

17 release, someone who knows one of the young women will notify them the video is online. This

18 becomes the first time the young women have ever heard of Defendants' main website:

19 www.girlsdoporn.com.

20 55.     When the young women reach out to Defendants, they discover Defendants have changed their

21 phone numbers (they use disposable phones and/or changeable Internet phone numbers) and have also

22 used fake names (e.g., PRATT often uses "Mark," GARCIA often uses "Jonathan," and WOLFE often

23 uses "Ben" or "Isaac"). Defendants then refuse to talk to the women, hang up on them, and/or block

24 their calls. If the women get in contact with Defendants' counsel, they refuse to even give Plaintiffs

25 copies of any signed documents and threaten them with legal action.

26 56.     After Defendants cause the videos to be distributed online, Defendants, their subscribers, and/or

27 Internet stalkers release Plaintiffs' real names online, usually on blogs followed by "fans" and

28 subscribers of www.girlsdoporn.com. Defendants also post pictures of Plaintiffs on

12

**COMPLAINT**

1  www.pornwikileaks.com, which they bought in November 2015.  The posts on

2  www.pornwikileaks.com also contain links to the women's social media accounts, their family's social

3  media accounts, high school information and other personal information that would garner attention

4  from people that want to find out intimate details about the women.  Defendants then embed

5  advertisements inside the posts on www.pornwikileaks.com that link to their subscription websites. As

6  a result (of which Defendants are cognizant), third parties often then stalk, harass, bully, and blackmail

7  the young women and their families – online, by telephone, and in-person.

8  57.      Once Defendants release the five to ten minute clip of the woman's video, it spreads like

9  wildfire through their hometowns, colleges, high schools, and workplace.  Within a day or two, almost

10  every person the woman knows has been sent a link to the video.  This appears to be designed by

11  Defendants in order to make the videos go viral by sending links to people close to Plaintiffs on social

12  media—whether it be family, friends, classmates, sorority members, etc., all of which can be gleaned

13  from viewing the Plaintiff's social media accounts.  Thus, when high school or college classmates or

14  coworkers get a link for the five to ten minute clip Defendants released, they are inclined to purchase a

15  subscription to Defendants' websites to see the entire 45 minute video.

16  58.      Because of Defendants, some of these young women lose relationships with friends, significant

17  others, and family.  Some lose or change jobs, and some are forced to leave their school.  Months to

18  years after the videos, many are still harassed by strangers on the Internet.  And almost all have

19  suffered severe psychological and emotional damage -- some have even considered and even attempted

20  suicide.

21  59.      Below, are more specific facts and claims relating to six young women.

22  **JANE DOE NO. 17**

23  60.      Around July 2015, JANE DOE NO. 17 was pursuing modeling as a career, in addition to being

24  a full-time student. While searching for modeling jobs on Craigslist.com, JANE DOE NO. 17

25  discovered a modeling advertisement for "Begin Modeling."  The advertisement contained a link to

26  www.beginmodeling.com.  As alleged above, www.beginmodeling.com website features modeling

27  pictures, not pornography.  Believing it was a typical modeling job, JANE DOE NO. 17 responded the

28  advertisement indicating she was interested.

61.     JANE DOE NO. 17 spoke with "Stephen" on the telephone and via text message about what the job would entail. JANE DOE NO. 17 is informed and believes that "Stephen" is really defendant MATTHEW WOLFE. WOLFE told JANE DOE NO. 17 that she would be taking "artistic pictures" and that some nudity would be involved. WOLFE told her she would be paid $650 for the shoot. During these discussions, WOLFE never told JANE DOE NO. 17 the job would entail pornography or that he and the other defendants operated www.girlsdoporn.com, had filmed hundreds of pornographic videos and published them on the Internet.

62.     To ensure she was comfortable with the nudity, WOLFE provided JANE DOE NO. 17 with a reference that she could speak with. She spoke with "Kaylin," whom she is informed and believes is defendant KAILYN WRIGHT. WRIGHT told JANE DOE NO. 17 a few things about the shoot, but never mentioned pornography. WRIGHT told JANE DOE NO. 17 that she felt very comfortable with Defendants and that they were very nice men.

63.     WOLFE told JANE DOE NO. 17 to meet her at the Omni Hotel in downtown San Diego. Once there, JANE DOE NO. 17 met WOLFE, who took her to the MAC store in Fashion Valley mall to get her makeup done. WOLFE still had not advised JANE DOE NO. 17 the job was to film pornography. After the mall, the two returned to the Omni Hotel.

64.     Once they reached the hotel room, WOLFE causally mentioned it would be a pornography. JANE DOE NO. 17 told him she would not film a pornography. WOLFE then offered three times the amount they had previously offered for the photos. JANE DOE NO. 17 refused again. WOLFE and GARCIA then told JANE DOE NO. 17 that she had nothing to worry about because the videos would never be released online. They then gave JANE DOE NO. 17 a vodka cranberry cocktail to drink to, as they put it, "loosen up." WOLFE became agitated when JANE DOE NO. 17 would still not agree to shoot the video. He then told her how she had caused them the spend large amounts of money and time setting up the shoot. He then offered her $4,000.

65.     Based on the representations made by WOLFE and GARCIA that she would remain anonymous, and needing money, JANE DOE NO. 17 reluctantly agreed to film the video under the belief that it would never be posted on the Internet.

66.     Prior to filming, GARCIA offered JANE DOE NO. 17 a hit of the marijuana he was smoking.

14

1  GARCIA told her that he should not have let her smoke it but it would be "our secret."

2  67.　　GARCIA and WOLFE coached JANE DOE NO. 17 how to act during the interview portion of

3  the video and how to answer questions. Multiple times during the filming of the interview portion,

4  WOLFE would make JANE DOE NO. 17 re-answer questions because she was either not acting happy

5  enough or did not like the answer. For example, at the time, JANE DOE NO. 17 was not dating

6  anyone. WOLFE did not like that answer and told her to say she had a boyfriend. In addition, she told

7  them she agreed to film the video because she needed the money to pay rent. They did not like this

8  response, and asked her to change it.

9  68.　　The filming was very painful. During one portion, JANE DOE NO. 17 gagged, vomited into

10  her mouth, and choked. She told them she needed to stop and go to the bathroom. They told her to stay

11  there and finish the scene. At one point during the filming, she was in such pain that she started crying.

12  WOLFE stopped filming, demanded that she go to the restroom to fix her makeup, and then re-shoot

13  the entire scene over. At this time, JANE DOE NO. 17 told WOLFE that she was wanted to leave the

14  hotel room and go for a walk to get some fresh air. WOLFE and GARCIA would not let her leave and

15  forced her to stand on the balcony instead. WOLFE told JANE DOE NO. 17 she needed to "get over

16  it" and that they would keep re-recording the scenes until she looked "into it."

17  69.　　A few months later, a friend sent JANE DOE NO. 17 a link to the video. Thereafter, all of her

18  friends and family quickly learned of the video. JANE DOE NO. 17 tried calling WOLFE, but he

19  blocked her number.

20  **JANE DOE NO. 18**

21  70.　　Around January 2016, JANE DOE NO. 18 was searching for modeling jobs on Craigslist. She

22  found a posting that included a link to the website www.ModelingGigs.com. As alleged above, this

23  website did not mention pornography and instead featured pictures of clothed women in typical

24  modeling poses. JANE DOE NO. 18 responded to the advertisement thinking it was for modeling.

25  71.　　She received a call from "Mark" and began exchanging emails, phone calls and text messages.

26  During her conversations, Mark told JANE DOE NO. 18 she would be paid $4,500 to shoot with a

27  male. JANE DOE NO. 18 told Mark she had serious concerns that it would end up online, and that she

28  was concerned her friends and family would find the video. Mark assured her they would not publish

1   the video on the Internet and it would instead be distributed in DVD.  Mark informed JANE DOE NO.

2   18 that the video would be distributed in Australia and South America.

3   72.   Mark provided a reference for JANE DOE NO. 18 to speak with, which she did.  The reference

4   told JANE DOE NO. 18 that the Defendants were great to work with and the job was easy.

5   73.   JANE DOE NO. 18 flew to San Diego on or about January 26, 2016.  At this time, she believed

6   she had the opportunity to either shoot still frame photographs, as depicted on the website, or film a

7   pornography.

8   74.   When she arrived, defendant GYI picked up JANE DOE NO. 18 from the airport and took her

9   to GARCIA's apartment.  JANE DOE NO. 18 waited there for hours alone until the makeup artist to

10   arrive.  The makeup artist arrived, did JANE DOE NO. 18's makeup, and then her, GARCIA and GYI

11   went to a hotel.  On the way to the hotel, GARCIA stopped to buy marijuana.

12   75.   JANE DOE NO. 18 again asked GARCIA and GYI about the distribution of the video.

13   GARCIA and GYI assured her it would not be published on the Internet.

14   76.   Once at the hotel, GARCIA and GYI presented JANE DOE NO. 18 with documents to sign.

15   They told JANE DOE NO. 18 the documents were just permission to use the video overseas.  They

16   again told JANE DOE NO. 18 the video would never be posted online, would never distributed in the

17   United States, that the video would never be connected to her, and that she would remain anonymous.

18   GARCIA and GYI yelled at JANE DOE NO. 18 that they were in a hurry and that she just needed to

19   sign them so they could start.

20   77.   JANE DOE NO. 18 told GARCIA and GYI she was nervous.  GARCIA and GYI therefore

21   gave her marijuana and several shots of vodka.  They also told JANE DOE NO. 18 she could stop

22   filming at any time.

23   78.   Prior to filming the interview portion, GARCIA and GYI coached JANE DOE NO. 18 on what

24   to say and how to act.  She advised them she was not comfortable lying, and they pushed her to do so.

25   They also told her she needed to act flirtatious and excited to be there, even if she was not.  They made

26   JANE DOE NO. 18 re-film different portions of the interview scene if they were not happy with her

27   answer, or if she was not flirtatious or excited enough.

28   79.   During filming, JANE DOE NO. 18 told GARCIA and GYI that she was in serious pain.

16

1    Several times, GYI stopped filming because JANE DOE NO. 18 was in visible pain.   When she told

2    them how much pain she was in, GARCIA and GYI assured JANE DOE NO. 18 the shoot was almost

3    over, which it was not.   The shoot continued on for hours.   Eventually, JANE DOE NO. 18 began

4    bleeding vaginally.   She demanded that GARCIA stop, and told GARCIA and GYI she was leaving.

5    When she tried to leave, GARCIA and GYI blocked the hotel room door and pushed her back.   They

6    then told her that if she did not finish filming, they would take back all of her money, publish what

7    footage they already had online with her name attached to it, and cancel her return flight home.   With

8    nowhere to go, and because Defendants controlled her flight home, JANE DOE NO. 18 had no choice

9    but to abide by GARCIA and GYI's commands until they were done with her.

10    80.   Once filming ended, GARCIA and GYI told JANE DOE NO. 18 she had to stay in the hotel

11    room, and film a "solo shoot" the next day, which she had never agreed to do.   JANE DOE NO. 18 told

12    them to leave, but they refused and ordered room service.   GARCIA and GYI smoked more marijuana

13    and began watching television.   Despite being promised four thousand five hundred dollars ($4,500),

14    GARCIA only paid JANE DOE NO. 18 $3,000.   JANE DOE NO. 18 told them she was owed more

15    money, and GARCIA said she could speak with Mark about that in the morning.   Eventually, they left.

16    81.   The next morning, JANE DOE NO. 18 called Mark to ask when her flight home was and how

17    she would get to the airport.   Mark told her someone would pick her up in the same black Escalade

18    they had previously picked her up from the airport in.

19    82.   Another man she did not recognize picked JANE DOE NO. 18 up from the hotel in the black

20    Escalade.   JANE DOE NO. 18 got in believing the man was taking her to the airport.   The man drove

21    JANE DOE NO. 18 to the airport.   However, once there, he told her that Mark had cancelled her flight

22    (which was scheduled for 10:19am) because she was going to shoot the solo video—something she had

23    repeatedly refused to do.   The driver advised JANE DOE NO. 18 he had driven to the airport because

24    he was there to pick up another young woman, which they did.   The man drove the two women back to

25    GARCIA's apartment.

26    83.   There, JANE DOE NO. 18 called "Mark" and told him she was owed the full $4,500 and that

27    she needed to leave immediately.   In response, "Mark" told JANE DOE NO. 18 they had paid her less

28    because her body was not as good as they thought, that she was "immature" for bringing up money, and

1  that if she wanted the full $4,500 she would have to film the solo scene. Mark continued to yell at her

2  on the phone trying to convince her to do the solo shoot.  JANE DOE NO. 18 refused, and Mark

3  eventually agreed fly her home that day.

4  84.      Around February 15, 2016, JANE DOE NO. 18 received a text message from high school friend

5  with a link to the video.  Thereafter, the video spread quickly to every one of JANE DOE NO. 18's

6  friends and family.

7  85.      JANE DOE NO. 18 is informed and believes and thereon alleges that "Mark" is actually

8  defendant PRATT.

9  **JANE DOE NO. 19**

10  86.      Around November 2016, JANE DOE NO. 19 responded to the advertisement and corresponded

11  with who she believes was defendant PRATT by email and text message.  PRATT told her that the job

12  was 30 minutes and only to the level to which she was comfortable.  JANE DOE NO. 19 asked PRATT

13  where the scenes would be distributed.  PRATT told her they would not post the video online, they

14  would not distribute the video in the United States, and that she would remain anonymous.  JANE DOE

15  NO. 19 also spoke with two reference women, who ratified PRATT'S representations.

16  87.      On November 15, 2016 around 7:00 p.m., YOUSIF picked JANE DOE NO. 19 up at the San

17  Diego airport and drove her to the Omni San Diego Hotel in downtown San Diego.  YOUSIF concealed

18  the fact JANE DOE NO. 19' modeling job was actually video pornography and destined for

19  www.GirlsDoPorn.com, for which she has worked for years.

20  88.      After JANE DOE NO. 19 arrived at the Omni San Diego Hotel, YOUSIF called PRATT and

21  GYI, but no cameraman showed up.  So, Defendants cancelled her flight home and made her stay in

22  the room alone all night.

23  89.      Around 9:00 a.m. on November 16, 2016, PRATT, GARCIA (going by his alias "Jonathan"),

24  GYI and a man named "Markus" arrived.  JANE DOE NO. 19 told the four (4) men she was

25  uncomfortable and asked to fly home to Seattle.  The four men got angry and cancelled her flight yet

26  again, then locked the hotel room.  They told her she had to do the pornography video, offered her

27  $4,000, and would only get her a flight home to Seattle when it was over.

28  90.      Defendants then offered JANE DOE NO. 19 alcohol and marijuana (which GARCIA was

18

**COMPLAINT**

1  already drinking and smoking), but she declined.  Defendants then handed her documents to sign, but

2  would not allow her to read them and again represented that she would remain anonymous.  They

3  assured her there was nothing to worry about, promised her privacy, and said nobody she knew would

4  see the videos.  The Defendants promised to email JANE DOE NO. 19 what she signed, but later

5  refused to.

6  91.     Relying on Defendants' representations of foreign, discrete distribution, and wanting to fly

7  home, JANE DOE NO. 19 participated in the video.  While making the video, JANE DOE NO. 19 told

8  them she was uncomfortable and wanted to leave.  Defendants told her there was no option to stop.

9  While making the video, JANE DOE NO. 19 was forced to perform sexual acts she did not agree to; if

10  she declined, GARCIA would manipulate her aggressively.

11  92.     After the video, Defendants refused to pay JANE DOE NO. 19 the full $4,000, and only paid

12  her $3,000, telling her, among other things, that her "body was a 10, but her face was a 7."

13  93.     Around January 2017, Defendants released JANE DOE NO. 19' video on

14  www.girlsdoporn.com and other websites, which were then discovered by her family, friends, co-

15  workers, and employer.  JANE DOE NO. 19 emailed PRATT asking him to take down the video, but

16  he ignored her.  JANE DOE NO. 19 called PRATT, then he said he did not know her and hung up.

17  JANE DOE NO. 19 then texted PRATT, saying she would have a lawyer contact him.  PRATT replied

18  with the following threat and denigration by text message: "lol yeah good luck we got all convos and

19  the entire fucking shoot on video your a joke [sic]."

20  94.     The Defendants, their subscribers, and/or third parties leaked JANE DOE NO. 19's real name

21  and her contact information (social media, phone, email, etc.) on other websites.  People then harassed

22  JANE DOE NO. 19 through social media, text message, and by phone.  She has had to go to counseling

23  for suicidal thoughts, is often unable to go out in public, has lost friends, and has had to delete her

24  social media and change her phone number.

25  **JANE DOE NO. 20**

26  95.     Around September 2015, JANE DOE NO. 20 responded to a Craigslist ad for modeling for

27  www.modelingwork.com.  That website, like the others, mentions nothing about pornography and

28  appears to be a company that photographs fashion models.

96.     "Mike@modelingwork.com" responded to JANE DOE NO. 20.  Mike eventually advised JANE DOE NO. 20 the job was for an adult film and they would pay her $5,000 for the video.  As requested, JANE DOE NO. 20 provided them with pictures of herself.  During a phone call, Mike told JANE DOE NO. 20 that the video would never be published online or distributed in the United States.  He also provided a phone number for "Cat" whom he said was a woman who had filmed a similar video that could confirm the video would not be published on the Internet.  JANE DOE NO. 20 and Cat exchanged text messages and spoke on the phone.  During these conversations, Cat advised that she had filmed a video for Defendants and that her video was not online and that nobody she knows has ever seen it.

97.     Mike booked a flight for JANE DOE NO. 20 to fly to San Diego.  However, JANE DOE NO. 20 had second thoughts and cancelled.  Mike began calling JANE DOE NO. 20 repeatedly.  When she answered, Mike began trying to convince JANE DOE NO. 20 to recommit to filming.  Mike confirmed over and over that the video would not be published online.  She again agreed to film the video based on these promises and representations.

98.     When they presented her with paperwork to sign, JANE DOE NO. 20 again sought reassurance the videos would not be published on the Internet, which they confirmed they would not do.  GARCIA represented the paperwork was for tax purposes.

99.     Defendants only paid JANE DOE NO. 20 $2,500 because, as GARCIA put it, she was "not what Mark expected," and because she had tattoos—something that was clearly visible from the photos she sent to Defendants before flying to San Diego.

100.    Around January 2016, Defendants published JANE DOE NO. 20's video on the Internet.  Thereafter, numerous people sent clips of the video to JANE DOE NO. 20 with rude and suggestive comments.

**JANE DOE NO. 21**

101.    In May 2015, JANE DOE NO. 21 responded to a Craigslist advertisement for modeling.  She began speaking with "Jonathan N," who told her they were seeking women for an adult gig in Southern California.  Jonathan offered to pay JANE DOE NO. 21 $3,500 to shoot a 30 minute film.  Jonathan told JANE DOE NO. 21 the video would be distributed on DVD overseas and not in the United States,

1    and assured they would not publish it on the Internet.  Jonathan also told JANE DOE NO. 21 she could

2    view the male performer's STI results before the filming began   .

3    102.    Jonathan provided names of several references with whom JANE DOE NO. 21 spoke.  The

4    references acted bubbly and enthusiastic about their experience with Defendants.  The references never

5    mentioned they were paid, and confirmed the videos would not be released on the Internet.

6    103.    JANE DOE NO. 21 agreed to fly to San Diego on the terms reached during these discussions

7    with Jonathan and the references.

8    104.    JANE DOE NO. 21 discovered that defendant GARCIA was the man with whom she had been

9    speaking that purported to be "Jonathan."  During the shoot, GARCIA demanded that she have sex in

10   ways she had not agreed to during her phone calls with Jonathan. When JANE DOE NO. 21 said no,

11   GARCIA told her they'd already paid her and that she was obligated.

12   105.    Around June 2015, Defendants released JANE DOE NO. 21 video despite the many

13   representations that it would not be.

14   **JANE DOE NO. 22**

15   106.    Around January 2015, JANE DOE NO. 22 responded to a Craigslist advertisement for modeling

16   with the headline "Females Escape The Snow And Make $5k."    A person using the email "Johnathan :

17   jobs@beginmodeling.com (sic)" told her the job would be 30 minutes of video and that "[n]one of your

18   personal information will be given out in the video or afterwards , no names etc are used in the video.

19   (sic)." Johnathan represented to JANE DOE NO. 22 the videos would be distributed on DVD in

20   Australia and New Zealand and would not be published online.

21   107.    Between January 2015 and July 2015, JANE DOE NO. 22 flew to San Diego and filmed three

22   videos for Defendants.

23   108.    Before filming each video, Defendants assured JANE DOE NO. 22 the videos would not be

24   published online and that she would remain anonymous.  Defendants reiterated this when they provided

25   JANE DOE NO. 22 with a contract to sign.  Each time, JANE DOE NO. 22 tried to read the documents

26   Defendants had provided her, but was rushed through by Defendants and she did not understand the

27   content she was able to read.  She did, however, understand Defendants representation that they would

28   not post the videos on the Internet.

1  109.    Around August 2015, JANE DOE NO. 22 learned that Defendants had published her videos

2  online.  When she contacted Defendants, they ignored her and blocked her phone calls.

3  **CAUSES OF ACTION**

4  **FIRST CAUSE OF ACTION**

5  **INTENTIONAL MISREPRESENTATION**

6  **(All Plaintiffs against All Named Defendants and ROES 1 - 500)**

7  110.    Plaintiffs incorporate by reference all of the preceding paragraphs contained in this complaint as

8  though set forth herein, including, without limitation, the agency and alter ego allegations.

9  111.    During Plaintiffs' discussions and negotiations with Defendants before each made an adult

10  video for Defendants (and simultaneous with Plaintiffs' attempted review of any purported

11  agreements), Defendants represented: they would not post the videos online (or cause such publication),

12  they would not distribute the videos in the United States (or cause such publication), and that Plaintiffs

13  would remain anonymous.  Defendants further represented at all times to Plaintiffs that would not cause

14  the videos to be posted online or distributed in the United States.  Defendants at all times assured

15  Plaintiffs there was nothing to worry about, promised privacy, and said nobody Plaintiffs knew would

16  see the videos.  Defendants caused other women to reiterate these representations to Plaintiffs.  Finally,

17  Defendants represented they would pay Plaintiffs certain sums of money; as set forth above, some of

18  Plaintiffs did not receive the sums represented.

19  112.    Those representations were false.

20  113.    Defendants intended that Plaintiffs rely on the above representations when each young woman

21  decided to make an adult video.

22  114.    Plaintiffs reasonably relied on the representations.

23  115.    Plaintiffs have been harmed by their reasonable reliance in that Defendants published their

24  videos online, published their videos in the United States, and released Plaintiffs' real names.

25  116.    Plaintiffs' reliance on these false representations was a substantial factor in causing their harm.

26  Plaintiffs have been harmed in an amount to be proven at trial, but that is, at least, $500,000 per

27  plaintiff, and consists of, at least: (a) serious emotional distress, including, but not limited to, bullying,

28  blackmail, loss of eating, loss of sleep, enduring fright, shock, nervousness, anxiety, depression,

22
**COMPLAINT**

1  embarrassment, mortification, shame, and fear; (b) compensatory damages, including, but not limited to

2  the difference in value in what the parties exchanged (i.e., the money Plaintiffs received for what they

3  were told was *limited* distribution and what Defendants profited through *global* distribution); and (c)

4  restitution / unjust enrichment damages (same calculation as the compensatory damages).  The Plaintiff

5  also seek injunctive relief.

6  117.   Defendants were acting individually and on behalf of each other when they made each of these

7  representations and, when one of them made a representation, the others ratified the representation

8  and/or knew of the misrepresentation and failed to correct it.

9  118.   Defendants also acted in a conspiracy when they committed this fraud as: (1) each of

10 Defendants had knowledge of and agreed to both the objective and course of action to injure Plaintiffs;

11 (2) pursuant to their agreement, Defendants intentionally mislead Plaintiffs at the time and place and

12 via the manner set forth above; and (3) pursuant to their agreement, Defendants injured Plaintiffs, as set

13 forth above.

14 119.   Defendants' actions were fraudulent, oppressive, and malicious and therefore warrant an award

15 of punitive damages pursuant to Section 3294 of the California Civil Code.

16                                    **SECOND CAUSE OF ACTION**

17                                    **FRAUDULENT CONCEALMENT**

18                      **(All Plaintiffs against All Named Defendants and ROES 1 – 500)**

19 120.   Plaintiffs incorporate by reference all of the preceding paragraphs contained in this complaint as

20 though set forth herein, including, without limitation, the agency and alter ego allegations.

21 121.   During Plaintiffs' discussions and negotiations with Defendants before each made an adult

22 video for Defendants (and simultaneous with Plaintiffs' attempted review of any purported

23 agreements), Defendants actively concealed their true identities (their individual names and, more

24 importantly, the identity of www.girlsdoporn.com, on which they intended to publish Plaintiffs nude

25 photos and sex acts).  At all these times, they actively concealed the fact their true intention was to post

26 the videos online and distribute them in the United States – or cause such publication and distribution.

27 At all these times, Defendants also concealed the facts regarding: (a) all of the other young women

28 whose lives they have irreparably damaged earlier by Defendants' video publication and promotion; (b)

1   all of the other young women imploring them to stop and to take down their videos; and (c) all of the

2   complaints that they (and their legal counsel) have received from other young women and their

3   families.

4   122.    Defendants owed Plaintiffs duties to disclose this information as, among other reasons, they

5   provided some information to Plaintiffs during correspondence, and during contract and business

6   negotiations.

7   123.    Defendants knew of, but knowingly concealed, the true facts regarding their identifies, their

8   website, their business, their video distribution, and the likelihood of injury to and harassment of

9   Plaintiffs.

10   124.    Defendants concealed these facts with the intent to induce Plaintiffs to make the adult videos.

11   125.    The concealed information was objectively material to any reasonable person and caused

12   Plaintiffs to make the adult videos.

13   126.    Plaintiffs justifiably relied on Defendants' false representations.

14   127.    Defendants' failure to disclose these material facts to Plaintiffs was substantial factor in causing

15   their harm.  Had Plaintiffs known of the undisclosed facts, they would not have made the adult videos.

16   128.    Plaintiffs' reliance on these false representations was a substantial factor in causing their harm.

17   Plaintiffs have been harmed in an amount to be proven at trial, but that is, at least, $500,000 per

18   plaintiff, and consists of, at least: (a) serious emotional distress, including, but not limited to, bullying,

19   blackmail, loss of eating, loss of sleep, enduring fright, shock, nervousness, anxiety, depression,

20   embarrassment, mortification, shame, and fear; (b) compensatory damages, including, but not limited to,

21   the difference in value in what the parties exchanged (i.e., the money Plaintiffs received for what they

22   were told was *limited* distribution and what Defendants profited through *global* distribution); and (c)

23   restitution / unjust enrichment damages (same calculation as the compensatory damages).  The Plaintiff

24   also seek injunctive relief.

25   129.    Defendants were acting individually and on behalf of each other when they made each of these

26   omissions and, when one of them made an omission, the others ratified the omission and/or knew of the

27   omission and failed to correct it.

28   130.    Defendants also acted in a conspiracy when they committed this fraud as: (1) each of

24

**COMPLAINT**

1 │ Defendants had knowledge of and agreed to both the objective and course of action to injure Plaintiffs;

2 │ (2) pursuant to their agreement, Defendants intentionally mislead Plaintiffs at the time and place and

3 │ via the manner set forth above; and (3) pursuant to their agreement, Defendants injured Plaintiffs, as set

4 │ forth above.

5 │ 131.   Defendants' actions were fraudulent, oppressive, and malicious and therefore warrant an award

6 │ of punitive damages pursuant to Section 3294 of the California Civil Code.

7 │ **THIRD CAUSE OF ACTION**

8 │ **FALSE PROMISE**

9 │ **(All Plaintiffs against All Named Defendants and ROES 1 - 500)**

10 │ 132.   Plaintiffs incorporate by reference all of the preceding paragraphs contained in this complaint as

11 │ though set forth herein, including, without limitation, the agency and alter ego allegations.

12 │ 133.   During Plaintiffs' discussions and negotiations with Defendants before each made an adult

13 │ video for Defendants (and simultaneous with Plaintiffs' attempted review of any purported

14 │ agreements), Defendants made promises to Plaintiffs that: they would not post the videos online (or

15 │ cause such publication), they would not distribute the videos in the United States (or cause such

16 │ publication), and Plaintiffs would remain anonymous.  Defendants promised Plaintiffs that would not

17 │ cause the videos to be posted online or distributed in the United States.  Defendants promised Plaintiffs

18 │ there was nothing to worry about, promised privacy, and promised nobody they knew would see the

19 │ videos.  Finally, Defendants represented they would pay Plaintiffs certain sums of money; as set forth

20 │ above, some of Plaintiffs did not receive the sums represented.

21 │ 134.   Defendants' affirmative promises were of material fact and important as Plaintiffs would not

22 │ have otherwise made the adult videos.

23 │ 135.   Defendants did not intend to perform these promises at the times they made them, and have not

24 │ performed as promised.  Defendants knew their promises were false and merely wanted Plaintiffs to

25 │ make the videos for Defendants' benefit.

26 │ 136.   Defendants intended to induce Plaintiffs to alter their positions in reliance on the promises by

27 │ making the adult videos.

28 │ 137.   Plaintiffs justifiably and reasonably relied on Defendants' promises and Defendants' affirmative

1 promises were an immediate cause of Plaintiffs' conduct.

2 138.    Defendants did not perform the promises.

3 139.    As an actual and proximate cause of Defendants' false promises and Plaintiffs' justifiable

4 reliance, Plaintiffs were damaged in that Defendants posted the videos online, distributed the videos in

5 the United States, and released Plaintiffs' names.

6 140.    Plaintiffs' reliance on these false representations was a substantial factor in causing their harm.

7 Plaintiffs have been harmed in an amount to be proven at trial, but that is, at least, $500,000 per

8 plaintiff, and consists of, at least: (a) serious emotional distress, including, but not limited to, bullying,

9 blackmail, loss of eating, loss of sleep, enduring fright, shock, nervousness, anxiety, depression,

10 embarrassment, mortification, shame, and fear; (b) compensatory damages, including, but not limited to

11 the difference in value in what the parties exchanged (i.e., the money Plaintiffs received for what they

12 were told was *limited* distribution and what Defendants profited through *global* distribution); and (c)

13 restitution / unjust enrichment damages (same calculation as the compensatory damages).  The Plaintiff

14 also seek injunctive relief.

15 141.    Defendants were acting individually and on behalf of each other when they made each of these

16 omissions and, when one of them made a false promise, the others ratified it, and/or knew of the false

17 promise and failed to correct it.

18 142.    Defendants also acted in a conspiracy when they committed this fraud as: (1) each of

19 Defendants had knowledge of and agreed to both the objective and course of action to injure Plaintiffs;

20 (2) pursuant to their agreement, Defendants intentionally mislead Plaintiffs at the time and place and

21 via the manner set forth above; and (3) pursuant to their agreement, Defendants injured Plaintiffs, as set

22 forth above.

23 143.    Defendants' actions were fraudulent, oppressive, and malicious and therefore warrant an award

24 of punitive damages pursuant to Section 3294 of the California Civil Code.

25 **FOURTH CAUSE OF ACTION**

26 **NEGLIGENT MISREPRESENTATION**

27 **(All Plaintiffs against All Named Defendants and ROES 1 - 500)**

28 144.    Plaintiffs incorporate by reference all of the preceding paragraphs contained in this complaint as

26
**COMPLAINT**

1  though set forth herein, including, without limitation, the agency and alter ego allegations.

2  145.    During Plaintiffs' discussions and negotiations with Defendants before each made an adult

3  video for Defendants (and simultaneous with Plaintiffs' attempted review of any purported

4  agreements), Defendants represented: they would not post the videos online (or cause such publication),

5  they would not distribute the videos in the United States (or cause such publication), and that Plaintiffs

6  would remain anonymous. Defendants further represented at all times to Plaintiffs that would not cause

7  the videos to be posted online or distributed in the United States. Defendants at all times assured

8  Plaintiffs there was nothing to worry about, promised privacy, and said nobody Plaintiffs knew would

9  see the videos. Defendants caused other women to reiterate these representations to Plaintiffs.

10  146.    The representations were false and although Defendants may have honestly believed that the

11  representations were true, they had no reasonable grounds for believing the representations were true

12  when they made them.

13  147.    Defendants intended that Plaintiffs would rely on the above representations in their decisions to

14  make the adult videos.

15  148.    Plaintiffs reasonably relied on Defendants' misrepresentations in their decisions to make the

16  adult videos.

17  149.    Plaintiffs' reliance on Defendants' false representations was a substantial factor in causing their

18  harm in that Defendants posted their videos online, published their videos in the United States, and

19  released Plaintiffs' names.

20  150.    Plaintiffs' reliance on these false representations was a substantial factor in causing their harm.

21  Plaintiffs have been harmed in an amount to be proven at trial, but that is, at least, $500,000 per

22  plaintiff, and consists of, at least, compensatory damages, including, but not limited to the difference in

23  value in what the parties exchanged (i.e., the money Plaintiffs received for what they were told was

24  *limited* distribution and what Defendants profited through *global* distribution).

25  ///

26  ///

27  ///

28  ///

**FIFTH CAUSE OF ACTION**

**MISAPPROPRIATION OF NAME AND LIKENESS [COMMON LAW]**

**(JANE DOE NO. 17, JANE DOE NO. 18, JANE DOE NO. 19, AND JANE DOE NO. 20 against**

**All Named Defendants and ROES 1 - 500)**

151.    Plaintiffs incorporate by reference all of the preceding paragraphs contained in this complaint as though set forth herein, including, without limitation, the agency and alter ego allegations.

152.    Defendants used Plaintiffs' names, likenesses, and/or identities without Plaintiffs' permission, though fraud, and/or without promised consideration, including, without limitation, on Defendants' websites (e.g., www.girlsdoporn.com), social media, and advertising.  Finally, any release purporting to give Defendants unconditional use of The Plaintiff's videos is unenforceable due to unclear terms, a lack of mental capacity/competence, mistake, undue influence, and/or Defendants' unclean hands.

153.    Defendants' gained a commercial benefit by using Plaintiffs' names, likenesses, and/or identities.

154.    Following Defendants' initial publication of each of Plaintiffs' videos on their own websites, and through the date of this amended complaint, Defendants have republished and redirected the misappropriated content to different websites and to different audiences.  Defendants have republished Plaintiffs' misappropriated likenesses to different audiences in various advertising campaigns on the Internet, including on third party websites (such as www.pornhub.com and www.youporn.com), where Defendants post varying and edited snippets of Plaintiffs' videos with embedded links and advertisements to Defendants' websites; these varying and edited snippets of Plaintiffs' videos have been viewed millions of times by hundreds of thousands of different individuals.  Defendants conduct the same form of repetitive mass advertising on their fan blogs and forums, and on their own social media.

155.    Plaintiffs' reliance on these false representations was a substantial factor in causing their harm. Plaintiffs have been harmed in an amount to be proven at trial, but that is, at least, $500,000 per plaintiff, and consists of, at least: (a) serious emotional distress, including, but not limited to, bullying, blackmail, loss of eating, loss of sleep, enduring fright, shock, nervousness, anxiety, depression, embarrassment, mortification, shame, and fear; (b) compensatory damages, including, but not limited to

28

**COMPLAINT**

1  the difference in value in what the parties exchanged (i.e., the money Plaintiffs received for what they

2  were told was *limited* distribution and what Defendants profited through *global* distribution); and (c)

3  restitution / unjust enrichment damages (same calculation as the compensatory damages).  The Plaintiff

4  also seek injunctive relief.

5  156.    Defendants also acted in a conspiracy when they committed this tort as: (1) each of Defendants

6  had knowledge of and agreed to both the objective and course of action to injure Plaintiffs; (2) pursuant

7  to their agreement, Defendants intentionally misappropriated Plaintiffs' names, likenesses, and/or

8  identities at the time and place and via the manner set forth above; and (3) pursuant to their agreement,

9  Defendants injured Plaintiffs, as set forth above.

10  157.    Defendants' actions were fraudulent, oppressive, and malicious and therefore also warrant an

11  award of punitive damages pursuant to Section 3294 of the California Civil Code.

12  **SIXTH CAUSE OF ACTION**

13  **MISAPPROPRIATION OF LIKENESS [CIVIL CODE § 3344]**

14  **(JANE DOE NO. 17, JANE DOE NO. 18, JANE DOE NO. 19, AND JANE DOE NO. 20 against**

15  **All Named Defendants and ROES 1 - 500)**

16  158.    Plaintiffs incorporate by reference all of the preceding paragraphs contained in this complaint as

17  though set forth herein, including, without limitation, the agency and alter ego allegations.

18  159.    On their websites (e.g., www.girlsdoporn.com), social media, and other advertising, Defendants

19  knowingly used Plaintiffs' names, voices, photographs, video, and likenesses to advertise or sell

20  subscriptions to Defendants' businesses.

21  160.    Defendants' use did not occur in connection with a news, public affairs, or sports broadcast or

22  account, or with a political campaign.

23  161.    Defendants did not have Plaintiffs' consent, obtained it though fraud, and/or without promised

24  consideration.  Finally, any release purporting to give Defendants unconditional use of The Plaintiff's

25  videos is unenforceable due to unclear terms, a lack of mental capacity/competence, mistake, undue

26  influence, and/or Defendants' unclean hands.

27  162.    Defendants use of Plaintiffs' names, voices, photographs, video, and likenesses was directly

28  connected to Defendants' commercial purpose.

29
**COMPLAINT**

163.   Following Defendants' initial publication of each of Plaintiffs' videos on their own websites, and through the date of this amended complaint, Defendants have republished and redirected the misappropriated content to different websites and to different audiences.  Defendants have republished Plaintiffs' misappropriated likenesses to different audiences in various advertising campaigns on the Internet, including on third party websites (such as www.pornhub.com and www.youporn.com), where Defendants post varying and edited snippets of Plaintiffs' videos with embedded links and advertisements to Defendants' websites; these varying and edited snippets of Plaintiffs' videos have been viewed millions of times by hundreds of thousands of different individuals.  Defendants conduct the same form of repetitive mass advertising on their fan blogs and forums, and on their own social media.

164.   Plaintiffs' reliance on these false representations was a substantial factor in causing their harm. Plaintiffs have been harmed in an amount to be proven at trial, but that is, at least, $500,000 per plaintiff, and consists of, at least: (a) serious emotional distress, including, but not limited to, bullying, blackmail, loss of eating, loss of sleep, enduring fright, shock, nervousness, anxiety, depression, embarrassment, mortification, shame, and fear; (b) compensatory damages and/or statutory damages, including, disgorgement of profits; (c) attorney fees; and (d) restitution / unjust enrichment damages (i.e., the money Plaintiffs received for what they were told was *limited* distribution and what Defendants profited through *global* distribution).  The Plaintiff also seek injunctive relief.

165.   Defendants also acted in a conspiracy when they committed this tort as: (1) each of Defendants had knowledge of and agreed to both the objective and course of action to injure Plaintiffs; (2) pursuant to their agreement, Defendants intentionally misappropriated Plaintiffs' names, voices, photographs, video, and likenesses at the time and place and via the manner set forth above; and (3) pursuant to their agreement, Defendants injured Plaintiffs, as set forth above.

166.   Defendants' actions were fraudulent, oppressive, and malicious and therefore also warrant an award of punitive damages pursuant to Section 3294 of the California Civil Code.

///

///

///

# SEVENTH CAUSE OF ACTION

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

**(JANE DOE NO. 17, JANE DOE NO. 18, JANE DOE NO. 19, AND JANE DOE NO. 20 against All Named Defendants and ROES 1 - 500)**

167.     Plaintiffs incorporate by reference all of the preceding paragraphs contained in this complaint as though set forth herein, including, without limitation, the agency and alter ego allegations.

168.     Defendants concealed the fact they run an online pornography website.  In order to get Plaintiffs to make adult videos, Defendants lied to Plaintiffs about the distribution.  They assured Plaintiffs there was nothing to worry about and promised privacy.  Defendants knew all of the other young women whose lives they have irreparably damaged earlier by Defendants' video publication and promotion; all of the other young women imploring them to stop and to take down their videos; and all of the complaints and they (and their legal counsel) have received from other young women and their families.  Defendants used Plaintiffs' videos and names to commercially promote their websites and enrich themselves.  This conduct was outrageous as it exceeded all bounds of common decency usually tolerated by a civilized society.

169.     Defendants intended to inflict the injuries stated herein upon Plaintiffs, or the injuries were substantially certain to result from Defendants' conduct.

170.     Defendants' outrageous conduct actually and proximately caused Plaintiffs to suffer serious emotional distress, including, but not limited to, loss of eating, loss of sleep, enduring fright, shock, nervousness, anxiety, depression, embarrassment, mortification, shame, fear, and – for some - consideration of suicide.  Plaintiffs have been harmed in an amount to be proven at trial, but that is, at least, $500,000 per plaintiff.

171.     Defendants also acted in a conspiracy when they committed this tort as: (1) each of Defendants had knowledge of and agreed to both the objective and course of action to injure Plaintiffs; (2) pursuant to their agreement, with their outrageous conduct, Defendants intentionally inflicted severe emotional distress upon Plaintiffs at the time and place and via the manner set forth above; and (3) pursuant to their agreement, Defendants injured Plaintiffs, as set forth above.

172.     Defendants' actions were fraudulent, oppressive, and malicious and therefore warrant an award

31

**COMPLAINT**

1  of punitive damages pursuant to Section 3294 of the California Civil Code.

2  ### EIGHTH CAUSE OF ACTION

3  ### NEGLIGENCE

4  **(JANE DOE NO. 17, JANE DOE NO. 18, JANE DOE NO. 19, AND JANE DOE NO. 20 against**

5  **All Named Defendants and ROES 1 - 500)**

6  173.   Plaintiffs incorporate by reference all of the preceding paragraphs contained in this complaint as

7  though set forth herein, including, without limitation, the agency and alter ego allegations.

8  174.   In their transactions and dealings with The Plaintiff, Defendants had a duty to use ordinary care

9  and to prevent injury to Plaintiffs based on the foreseeability of harm to Plaintiffs, the degree of

10  certainty The Plaintiff would suffer injuries, the closeness of connection between Defendants' actions

11  and Plaintiffs' injuries, the moral blame attached to Defendants' conduct, the policy of preventing

12  future harm, and the extent of Defendants' burden and the consequences to the community of imposing

13  duty and liability.

14  175.   Defendants' above-described actions and omissions (e.g., lying about and concealing the fact

15  they run an online pornography website upon which they planned to post the videos; and assuring

16  Plaintiffs there was nothing to worry about – all while knowing that release of the videos would cause

17  harassment and severe emotional damage), breached the duty of care.

18  176.   Defendants' breach of the duty of care actually and proximately caused Plaintiffs harm in an

19  amount to be proven at trial, but that is, at least, $500,000 per plaintiff, and consists of, at least: (a)

20  serious emotional distress, including, but not limited to, bullying, blackmail, loss of eating, loss of

21  sleep, enduring fright, shock, nervousness, anxiety, depression, embarrassment, mortification, shame,

22  and fear; (b) compensatory damages, including, but not limited to the difference in value in what the

23  parties exchanged (i.e., the money Plaintiffs received for what they were told was *limited* distribution

24  and what Defendants profited through *global* distribution); and (c) restitution / unjust enrichment

25  damages (same calculation as the compensatory damages). Plaintiffs also seek injunctive relief.

26  ///

27  ///

28  ///

## NINTH CAUSE OF ACTION

## BREACH OF CONTRACT

### (All Plaintiffs against All Named Defendants and ROES 1 - 500)

177.    Plaintiffs incorporate by reference all of the preceding paragraphs contained in this complaint as though set forth herein, including, without limitation, the agency and alter ego allegations.

178.    Plaintiffs entered into oral agreements with Defendants whereby Plaintiffs agreed to make their respective videos with the conditions: they would not post the videos online (or cause such publication), they would not distribute the videos in the United States (or cause such publication), and they would ensure their privacy and anonymity.

179.    Plaintiffs performed all of their obligations under the agreements; in particular, they participated in the video shoots.

180.    All conditions required for Defendants' performances occurred, but they breached the contract by distributing and/or causing the videos to be posted online and in the United States, and by failing to ensure Plaintiffs' privacy and anonymity.  Also, as set forth above, some of Plaintiffs did not receive the sums agreed upon for their video(s).

181.    As an actual and proximate cause of Defendants' breach, Plaintiffs were damaged in an amount to be proven at trial, but believed to be, at least, $500,000 per plaintiff.

## TENTH CAUSE OF ACTION

## PROMISSORY ESTOPPEL

### (All Plaintiffs against All Named Defendants and ROES 1 - 500)

182.    Plaintiffs incorporate by reference all of the preceding paragraphs contained in this complaint as though set forth herein, including, without limitation, the agency and alter ego allegations.

183.    Defendants made clear and unambiguous promises to Plaintiffs that: they would not post the videos online (or cause such publication), they would not distribute the videos in the United States (or cause such publication), and they would ensure their privacy and anonymity.

184.    Plaintiffs relied on these promises in that they made the videos.

185.    Plaintiffs' reliance was both reasonable and foreseeable.

186.    Plaintiffs were injured as a result in that Defendants distributed or cause the distribution of the

33

COMPLAINT

1   videos online and in the United States, and failed to ensure Plaintiffs' privacy and anonymity.

2   187.   Injustice can be avoided only by an award of compensatory and consequential damages in the

3   amount of, at least, $500,000 per plaintiff.

4   **ELEVENTH CAUSE OF ACTION**

5   **VIOLATION OF BUSINESS & PROFESSIONS CODE §§ 17200, et seq.**

6   **(All Plaintiffs against All Named Defendants and ROES 1 - 500)**

7   188.   Plaintiffs incorporate by reference all of the preceding paragraphs contained in this complaint as

8   though set forth herein, including, without limitation, the agency and alter ego allegations.

9   189.   Defendants' conduct constitutes a "business practice" under Business & Professions Code,

10  Section 17200, et seq. ("Section 17200").

11  190.   Defendants' "business practice" constitutes "unlawful" conduct under Section 17200, as it

12  violates common and California statutory law.  Defendants' "business practice" constitutes

13  "fraudulent" conduct under Section 17200, as it deceives – and is likely to deceive – members of the

14  public.

15  191.   Defendants intended their conduct to cause – and it did so cause – Plaintiffs to suffer economic

16  injury in fact and caused Defendants to receive ill-gotten gains.  Plaintiffs were damaged – and

17  Defendants unjustly enriched - in an amount to be proven at trial, but believed to be, at least, $500,000

18  per plaintiff.  As such, Plaintiffs have individual standing under Section 17200.

19  192.   Pursuant to the remedies provisions of Section 17200: Defendants owe Plaintiffs restitution of

20  Plaintiffs' property (e.g., videos and images); the Court should enjoin Defendants' violative conduct;

21  and the Court should issue the maximum civil penalties permitted.

22  **TWELFTH CAUSE OF ACTION**

23  **FRAUDULENT TRANSFER**

24  **(All Plaintiffs against All The Named Defendants and ROES 475 - 550)**

25  193.   Plaintiffs incorporate by reference all of the preceding paragraphs contained in this complaint as

26  though set forth herein, including, without limitation, the agency and alter ego allegations.

27  194.   Plaintiffs have a right to payment from Defendants for the claims in this action and are, thus,

28  creditors.

1   195.    On information and belief, Defendants transferred Plaintiffs' videos and the revenue generated

2   therefrom to defendant Oh Well Media Limited, Sidle Media Limited, Greenhill Services, Ltd., and or

3   Bubblegum Films, Ltd (sham entities located in Vanuatu used to hide assets) and ROES 200 – 250 with

4   the intent to hinder, delay, or defraud Plaintiffs in their collection efforts on the subject claims.

5   196.    Plaintiffs were harmed as, among other things, they still have not received compensation for the

6   claims in this action.

7   197.    Defendants' conduct was a substantial factor in causing Plaintiffs' harm.

8   198.    Defendants' actions were fraudulent and malicious and therefore warrant an award of punitive

9   damages pursuant to Section 3294 of the California Civil Code.

10                          **THIRTEENTH CAUSE OF ACTION**

11                               **DECLARATORY RELIEF**

12              **(All Plaintiffs against All Named Defendants and ROES 1 - 500)**

13   199.    Plaintiffs incorporate by reference all of the preceding paragraphs contained in this complaint as

14   though set forth herein, including, without limitation, the agency and alter ego allegations.

15   200.    An actual controversy exists over the enforceability of all agreements executed by the parties to

16   this lawsuit, including any release executed by Plaintiffs purporting to give Defendants the right to use

17   their likeness.

18   201.    In addition, an actual controversy exists over whether defendants are alter egos and whether

19   they may be held liable for each other's actions or inactions.

20                               **PRAYER FOR RELIEF**

21          WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

22          A.      For compensatory damages of, at least, $1,000,000.00 per plaintiff;

23          B.      For restitution and disgorgement of ill-gotten gains/unjust enrichment;

24          C       For civil penalties;

25          D.      For an injunction;

26          E.      For punitive damages;

27          F.      For attorney fees;

28          G.      For prejudgment interest;

H.   For costs of suit;

I.   To set aside all fraudulent transfers of assets;

J.   A judicial declaration that all contracts or releases executed by Plaintiffs are unenforceable as a matter of law;

K.   A judicial declaration that defendants are alter egos of one another and may be held liable for each other's debts and obligations; and

L.   For such other and further relief as the Court deems just and proper.

Date: November 7, 2017

By: */s/ Brian M. Holm*
Robert Hamparyan
John J. O'Brien
Brian M. Holm
**Attorneys for Plaintiffs**

36
**COMPLAINT**